CASE 17.—SUIT OF J. L. BRUCE, ADMINISTRATOR OF SAMUEL HARDING, TO SETTLE THE ESTATE, TO WHICH LUCY W. HARDING ANSWERED, SETTING UP CLAIMS.—February 18.

# Harding's Admr. v. Harding

Appeal from Boyle Circuit Court.

W. C. BELL, Circuit Judge.

From the judgment, both plaintiff and claimant appeal.—Reversed.

1. Wills—"Legacy"—Definition.—A "legacy" is a gift by will of personal property.

2. Wills—Form—Creation of Legacy.—As a gift presupposes ownership on the part of the giver, a legacy is usually created by use of some word or phrase expressing testator's intention to invest the legatee with the title to certain specific personal property, upon the testator's death.

3. Wills—Construction—Recognition of Indebtedness.—One item of a will recited that testator had $13,000 in notes and contracts

Harding's Admr. v. Harding.

which belonged to his wife, some in his name and some in. hers, and recited that: "I recognize this indebtedness to her- with interest from this date and it is my will that my estate· guarantee and pay the whole sum as though it was a debt. due from me to her as indeed it is." By the next item the wife was given one-third of the remainder of the estate after testator's debts, "including the above to her," are paid, etc.. Held, That the first item was not a bequest or the creation of a legacy, but was intended to be the evidence of an in- debtedness of testator to his wife.

4. Executors and Administrators—Claims—Credits.—A will recited that testator had in his possession $13,000 in notes and con-- tracts belonging to his wife, and provided that his estate should be responsible for payment of the sum to her, with interest from the date of the will. Testator had managed his wife's property as her agent, and continued to do so after the date of the will. Held, That dividends on bank stock of the- wife in the husband's possession, accruing after the date of· the will, and which he had reinvested for her, not being part of the original debt, should not be allowed as a credit thereon,. but should be an additional charge against the estate.

5. Executors and Administrators — Claims — Evidence.— Checks. drawn on the wife's account by her husband as agent, after· the date of the will, the proceeds of which were used for her· benefit to procure contracts or notes, or to pay her taxes, etc.,. were not. evidences of indebtedness of the husband to the wife whether the proceeds were included in the original debt. or not, and she was not entitled to credit therefor in comput- ing the estate's indebtedness to her.

6. Executors and Administrators—Claims—Evidence.—The hus-- band having acted as the wife's agent, and it appearing that. several of the notes included in the debt, and referred to in the will as being in the wife's possession, were collected by· the husband, and that none of them is in existence, it will be. presumed, after a lapse of nine years, that he collected all. of them, and the estate should be charged with the amount. thereof, with interest from the date of the will, especially in view of the fact that testator had indorsed them, guaranteeing their payment.

7. Executors and Administrators—Claims—Rent of Wife's Lands. —The wife having made no claim for rent of her land occupied by the husband since the date of. the will, in her answer in. the administrator's suit, and having presented no claim to the master commissioner to whom the case was referred, and there being nothing to indicate that the husband expected to,

pay rent, nor that the wife expected it, it should not be charged to the estate as part of the indebtedness.

8. Executors and Administrators—Claims—Evidence.—The wife's stock in a turnpike road having been sold, and payment made by checks payable to her, which were indorsed by her, she presumably received the proceeds, and they should not be charged as part of the estate's indebtedness to her.

9. Executors and Administrators—Claims—Trust Funds.—The estate having been charged, with the original indebtedness acknowledged by the will, the wife was not entitled to credit for proceeds of a note, where the money for which it was given was part of the original debt.

10. Executors and Administrators—Claims—Credits.—Taxes personally paid by testator on his wife's property, he having the management of her business and control of her money, should not be set off against the indebtedness to the wife, since if he had intended that the amount should be a charge against her, he would have paid it out of her money.

11. Court Commissioners—Compensation of Master Commissioners. —Ky. Stats., 1909, section 1740, provides that a master commissioner shall receive $3 per day, and certain percentages for the collection and disbursement of money. Section 396 provides that no allowance shall be made to a commissioner until he has filed in court a written statement under oath of the number of days he has acted. Held, That the provision of section 1740 as to the per diem, and section 396, are mandatory, and the court can not exceed the amount provided, nor pay it in the absence of the statement; and where it appeared that a commissioner was entitled to a per diem of only $600, and the most of the estate that he could possibly handle was $76,600, an allowance of $3,000 was in excess of the statutory fee; the percentage being payable only on money actually received and paid out, and was improperly allowed, especially where the record contains no statement required by section 396.

12. Executors and Administrators—Settlement—Compensation.— Ky. Stats., 1909, section 3883, provides that an administrator's allowance shall not exceed 5 per cent on all accounts received and disbursed, but that upon proof and notice the court may make an additional reasonable allowance, not to exceed a fair compensation for time occupied, and 5 per cent on all amounts received and distributed. Decedent left his business in an unsettled condition, and the administrator had to operate his planing mill for several months; finish buildings under way at decedent's death; settle with from 600 to 800 persons

owing decedent; had to be present at a hearing before a master commissioner for over 200 days; and he conducted sales of property amounting to $50,000; collected over $70,000; and paid claims of over $30,000. The estate amounted to over $100,000. The court allowed the administrator as a fee about 5 per cent upon the money which he had handled, and there was a large part of the estate yet to be disposed of, notes to be collected, and the business of the estate to be closed. Held, That he was entitled to a further allowance of $1,000 for compensation for services which he would be required to perform in winding up the estate subsequent to the former allowance.

13. Executors and Administrators—Settlement—Attorney's Fees.— An attorney employed by an administrator is entitled to a reasonable fee; and, while he should have a more liberal allowance for advising in the settlement of a large estate than where less money is involved, his fee should, in the main, be regulated by the character of the services rendered.

14. Executors and Administrators—Settlement—Attorney's Fees.— An estate consisted of over $100,000 worth of personal and real property. An attorney advised the conversion of the whole of it into cash, advised the administrator from his qualification for about six years, filed an administration suit and conducted the litigation, which was spirited and at times acrimonious; three branches thereof reaching the court of appeals. The first appeal involved the administrator's right to sell the real estate, and the other appeals involved claims against the estate, amounting to over $46,000. The court upheld the administrator's right to sell the land, and in the other cases claims of about $35,000 were defeated. The attorney attended sittings of a master commissioner for over 200 days, giving careful attention to the litigation, and as an incident to his employment involved himself in a bitter family quarrel; he being the brother of decedent, whose wife was the principal claimant in the litigation. Held, That he was entitled to a fee of $5,000.

ROBERT HARDING for appellant.

C. H. RHODES of counsel.

AUTHORITIES CITED.

Warfield v. Gardner, Admr., 79 Ky. 584; Usher's Exrs. v. Flood, 12 Ky. Law Rep. 722; 2 Duvall 122; Homer v. Harris, 10 Bush 357; Millet v. Watkins, 4 Bush 642; Worthley v. Hammond, 13 Bush

510; Tubue v. Hams, 1 Met. 597; Leach v. Kendall, 13 Bush 424; Nutall v. Broauin, 5 Bush 11; Dewhurst v. Sheppard, 102 Ky. 239; Gulley v. Prather, 7 Bush 167; Shields v. Smith, 8 Bush 601; Adkisson v. Dent, 88 Ky. 628; Messman v. Worthington's Exrs., 24 Ky. Law Rep. 2116.

BRECKINRIDGE & BRECKINRIDGE for appellee.

M. C. SAUFLEY of counsel.

### AUTHORITIES CITED.

Am. & Eng. Ency. of Law, 2d Ed., volume 23, pp. 132-3, and authorities cited; Stevenson v. Huddleson, 13 B. Monroe 299; Swinebroad v. Bright, 23 Ky. Law Rep. 55; Duncan's Trustee v. Clay, 13 Bush 48; Russell v. Averitt, 19 Ky. Law Rep. 202; Wathen v. England, 19 Ky. Law Rep. 1601; McHenry v. Winston, 105 Ky. 307; Fid. Nat'l Bank v. Youtsey, 26 Ky. Law Rep. 390; Ky. Stats, section 1740; Ky. Stats., section 3883; Hays v. Johnson's Admr., 30 Ky. Law Rep. 618.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

Samuel Harding died in January, 1903, leaving a will, in which he named his wife, Lucy W. Harding, as executrix. The will was, in due time, probated, but his widow declined to qualify, and J. L. Bruce was appointed administrator with the will annexed. He proceeded to settle the estate, and in the course of time brought a suit for that purpose. In his suit for settlement, the administrator, among other things charged that he was advised that the widow was claiming large sums of money from the estate, and he asked that she be required to make out and prove her claims. Likewise that her brother, John G. Weisiger, be required to prove and set up any claim which he was asserting against the estate. Thereafter the widow filed her answer, in which she claimed that her husband owed her $13,000, with interest from November

27, 1894, as evidenced by a clause in his will, and, in addition thereto, that he owed her $10,470, with interest, and also $1,199.80. The particular items which go to make up these last two claims are fully set out in the answer. A motion was made by the administrator that the widow be required to make her answer more specific and definite as to the history of the transactions which went to make up the different items of account set out in her answer. This motion was overruled. The administrator filed a reply, controverting the material allegations of the answer, and in this reply plaintiff denied that decedent was indebted to his widow in any sum whatever, save and except the $13,000 mentioned in his will, and that there should be credited on this claim the sum of $6,803.36, the amount which the widow admitted in her answer that she had received in notes from her said husband. The administrator also pleaded that the decedent had paid, in taxes for his wife upon her property, $1,777.42, and that this sum, less a credit of $389 which had been refunded to him, should go as a credit upon the $13,000. The case was referred to the master commission to hear proof on, and report all claims against, the estate of Samuel Harding. He advertised his sittings, heard proof on all claims that were presented, and at the April term, 1904, filed his report.

In this report he allowed to the widow, Lucy W. Harding, as valid claims against the estate, the following: Thirteen thousand dollars, with interest to April 18, 1904, making $20,325.50; a claim of $10,470, with interest to same date, making $15,734.43, and $1,199.80, with interest to same date, amounting to $1,956.66. He also allowed to the widow her claim amounting to $3,270.69; this last claim being the guar-

anty which her husband had given to her at the time
he had indorsed the notes making up this sum to her.
No loss had at this time been sustained by the widow
upon these notes; but, inasmuch as her husband had
guaranteed their payment, this fact was reported to
the court.  It appears that when these claims were
presented, no proof was taken by either side, and
therefore the master allowed them as presented.  Ex-
ceptions were filed to the report allowing each of these
claims, and the case was again referred to the master
commissioner, with directions to hear proof and re-
port on the exceptions filed to said claims.  This was
in May, 1904.  The commissioner heard proof, and
reported to court, at the April term, 1906, that after
a lapse of two years, in which time he had expended
more than 200 days in taking proof, he found it im-
possible to report on the claims of the widow sep-
arately with any degree of accuracy, and that, consid-
ering all of her claims together, if the $13,000 named
in the will should be treated as a bequest, and not as
an evidence of indebtedness, then the estate of dece-
dent was indebted to Lucy W. Harding in the sum of
$31,117.89, while if, on the other hand, the $13,000
named in the will should be treated as an evidence of
indebtedness, then the $31,117.89 should be credited
by the $8,145.27, the amount of the notes with their
interest, which the said widow admitted having re-
ceived from her husband,, in which last-named event
the estate would be indebted to Lucy W. Harding in
the sum of $23,032.62.  The $8,145.27, referred to by
the commissioner as notes which should be deducted
from the sum total of appellee's claim, evidently
should be $6,803.36, as this is the amount which she
admitted she had, so that, deducting this from the
$31,117.89 would leave $24,214.53, which sum he evi-

dently intended to report.  All of the evidence heard by the commissioner was reduced to writing, and filed with and made a part of his report.  Exceptions were filed by both the administrator and the widow to this report.

The case was submitted for judgment upon the pleadings, exhibits, commisisoner's report, and exceptions filed thereto, and the court found in favor of the claimant, Lucy W. Harding, in the sum of $29,498.78, as of September 27, 1906, subject to a credit of $6,803.36; this being the amount of the notes which she held in her hands as shown by her answer, with the interest on said notes calculated to September 27, 1906.  A judgment was accordingly entered in favor of Lucy W. Harding for said sum.  It was further provided in the judgment that she might return the notes, above referred to, to the administrator on or before the 1st day of January, 1907, in which event they would not be credited upon the judgment entered in her favor.  The judgment also provided that if the claimant had collected any money on any of said notes, the sums so collected should be entered as a credit upon her claim.  All of the exceptions filed to the depositions were overruled, except the exceptions to the deposition of the claimant relating to transactions between herself and her husband, and these were sustained.  On proof heard the court fixed the allowance of the plaintiff, administrator, at $3,500, and that of his attorney at $4,000, and he allowed the commissioner, for his services, the sum of $3,000.  With the judgment and orders fixing the allowance of the commissioner, plaintiff, and his attorney, both plaintiff and claimant,Lucy W. Harding, are dissatisfied, and they have each prayed, and been granted, an appeal to this court.

The will under consideration, which is a model for brevity and simplicity is as follows:

"I, Samuel Harding, do make this my last will and testament written wholly by my own hand, revoking all other wills made by me.

"Item First. I have in my hands belonging to my wife thirteen thousand dollars in notes and contracts showing indebtedness to me or her from others, whether in my own name or hers this is nevertheless the property of my wife to the extent of thirteen thousand dollars, exclusive of some notes she holds in her possession, and I recognize this indebtedness to her with interest from this date, and it is my will that my estate guarantee and pay the whole sum as though it was a debt due from me to her as indeed it is.

"Item Two. I give to my beloved wife, Lucy W. Harding, one-third of all the remainder of my estate after my debts (including the above to her) are paid absolutely and unconditionally, and I give the remaining two-thirds to her for and during her natural lifetime, the remainder interest to go as though I had died intestate to my brothers and sisters or their descendants should I survive them.

"Item Three. I appoint my wife, Lucy W. Harding, executrix of this my will and invest her with full power to sell and convey any and all of my real and personal estate as she may think best.

"In testimony of all of which witness my signature this 27th day of November, 1894.

"Samuel Harding."

Some question has been raised over item 1 as to whether it is a legacy or merely the recognition of a debt to his wife by the testator. A legacy is defined by Webster to be a "gift by will of personal property," and this definition is substantially the same as

that given by Black and Bouvier in their law dictionaries. A gift presupposes ownership on the part of the giver or donor, and a legacy is usually created by the use of some appropriate word or phrase expressing the testator's intention or desire to invest the legatee with the title to certain specific personal property upon the death of the testator. While any word or phrase that will convey this meaning may be used, there are certain words which, by common consent and custom, are usually used to create a legacy. These are the words "give," "devise," and "bequeath." Though the word "devise" is more frequently used in passing or disposing of real estate by will, it is sometimes used by testators in disposing of personal property. None of these words are used in item 1, nor is there any word or phrase therein that would tend, in the slightest degree, to show that in this clause of his will the testator was proposing to make his wife a gift or bequest. On the contrary, he says, in language so plain that it leaves no room for doubt, that he holds of his wife (not his own) money and notes to the amount of $13,000, and he charges himself with the same, and pledges his entire estate to pay it, with interest from the date of the will. If there could be any doubt as to what the testator meant by the language used in item 1, it would be made plain by a consideration of item 2. In this item we find the testator making disposition of his entire estate, after the payment of his debts, and he again speaks of item 1 as one of the debts which he directs paid, and, having directed the payment of his debts in item 2, he proceeds to make a bequest to his wife, in which it will be noted there is a radical difference in the language used. In the first clause he says, "I have in my hands, belonging to my wife, $13,000.00,"

etc., while in item 2 he says "I give to my beloved wife," etc. The testator understood his obligation as a debtor and his duty as a husband, and knew well how to express each. Considering the entire will, we must conclude that item 1 is not a bequest, or the creation of a legacy, but was intended by the testator to be the evidence of an indebtedness on his part to his wife.

The will under consideration furnishes an admirable insight into the character of the testator. At the time he married, all of his wife's personal property, which he reduced to possession, became his absolutely. He and appellee were married in 1879, and from that time until the date of the will he had the management and control of his wife's property. She had sold a farm for $7,500. This money had been turned over to him to be managed by him. She also owned certain bank stocks, and the dividends declared upon this stock were regularly turned over to him for investment for his wife. All of this money had been reduced to his possession. Just shortly before the execution of the will the Legislature had passed an act radically changing the rights of married women in regard to their property. The testator was evidently uncertain as to just what the rights of his wife under the law would be, and hence he so worded his will that there could be no uncertainty as to the capacity in which he held her money; and also made such provision as would prevent his wife from having any trouble in securing her property in the event of his death. The record shows that he had managed his wife's business, loaned her money; collected and reloaned it from the date of the marriage to the date of the will. He had received, during these years, from the sale of her land and from dividends upon the stock, $12,899.80 in the aggregate. That he managed

her affairs well and profitably for her is evidenced by
the fact that in November, 1894, when the will was
written, he held notes, contracts, and accounts be-
longing to his wife of the face value of $13,000. He
had taken notes for her, which were then in her pos-
session, amounting to $1,199.80, and during this time
he had bought for her, and taken the title to her, bank
stock at a cost of $1,800, a cottage costing nearly $700,
and she had expended, for horses, taxes, and other
items during the 14 years from their marriage to the
date of the will, more than $3,000. This recitation
from the record as to how the business affairs of ap-
pellee were managed by her husband before the will
was written is given for the purpose of throwing what
light it may upon the transactions that have occurred
since that time.

Appellee's bank book shows that upon the date
when the will was written she had in bank to her
credit $23.80, and so far as the record shows this,
together with the indebtedness and notes mentioned in
the will, constituted all of her personal property,
except her bank stock. Her husband continued to
manage her business affairs after the will was written
just as he had theretofore done, and during the years
between November 27, 1894, and his death in 1903, he
collected, on notes, accounts, contracts, interest and
dividends on bank stocks, and deposited in bank to the
credit of his wife $11,716.45. A part of this sum was
necessarily represented by notes and contracts which
formed a part of the $13,000 he held. During the same
period he drew out of bank all of the money which
was standing to his wife's credit, excepting $16, and
reinvested it in other notes and property for his wife,
as the checks show upon their face the purposes to
which the money was applied; and, while all of these

notes have not been accounted for and traced with accuracy, appellee admits in her answer that she had at that time in her possession notes, which her husband so took for her, of the face value of $6,803.36. The testator's aim seems to have been to keep all of his wife's money at interest, and the record shows that he would reinvest in new notes as fast as collections were made. As all of these transactions were made through the bank, some confusion has arisen in attempting to determine how much of the original debt enters into the new transactions evidenced by the bank deposits, during the 8 years after the will was written. Necessarily many of the debts that were then in existence have been paid off, and the money collected and reloaned again, and it is next to impossible to tell how much of these deposits represent original debts, and how much reloans of the same money. For instance, A., at the date of the will, owed $100, and this $100 was a part of the $13,000. He paid his debt, and the $100 was deposited in bank by testator to the credit of his wife. B. desired to borrow $100, and this money was checked out to B. At the end of a year he pays his debt, $106, and this money is deposited in bank by testator to the credit of his wife. Immediately $100 is loaned to C. for one year. He pays his debt at maturity, $106, and this is deposited in bank. Now we have in this transaction but $100 of the original debt paid, and yet the bank book and the checks show that $312 have been deposited and $300 paid out. From this illustration it is plain to be seen that the notes and contracts taken since the date of the will can not be accepted as credits upon the debt in existence at that time, unless it is shown that they went into the fund and formed a part of it. The bank deposits made since the date of the will are

made up of three items: Collections on debts existing when the will was written, interest on notes, and dividends on bank stock. Now appellee has in her hands, according to the court's finding, notes of the value of $6,803.36. If any of these were paid with new money —that is, money which did not represent a part of the old debt—then to this extent they should not be allowed as a credit on the old debt. These bank dividends, covering the period under consideration, amounted to $3,063, and this entire sum went into the business transactions which testator had for his wife. In other words, he loaned it out, and of course, as she furnished this money, this sum must be excluded from consideration in determining what credits the $13,000 is entitled to.

Appellee urges that she should be allowed credit for the checks to which we have referred as being drawn on her account by her husband since 1894, and amounting in the aggregate to $10,470.54. The checks themselves show what they were for, and appellee has been given the benefit of the purchasing power of each check by having the notes or contracts transferred to her, where the checks were for that purpose, or by receiving credit for taxes paid, etc. These checks are not evidence of indebtedness, but merely the evidence of various business transactions which appellee's husband conducted for her as her agent. The testimony of appellee's brother abundantly establishes this fact, if any proof was wanted or needed to support the evidence furnished by the checks themselves. Appellee has had the benefit of every transaction represented by these checks. Her husband collected and received her money for her, put it into the bank to her credit, and, when he found a suitable place to loan it again, or needed it to pay her taxes, or any other debt for

her, he checked it out. In all of these transactions he acted as her agent, and had she conducted this business in person, she would have had to check out the money just as her husband did for her. Of course, if the latter plan had been pursued, it would not be pretended that the checks constituted evidence of debt against testator. When it is remembered that these acts of testator in regard to these checks were all conducted in his representative capacity as agent for his wife, it is readily seen how little merit there is in this claim, based upon these checks. The record shows that several, but not all, of the notes which the will referred to as being in appellee's possession were collected by testator; but, as he was acting in the general capacity as agent for his wife, it is fair to presume, from the lapse of time and the further fact that none of these notes are now shown to be in existence, that he collected all of them, and his estate is therefore chargeable with the full amount thereof, with interest from the date of the will. Appellee in her answer asked that the estate of her husband be charged with the notes which he had turned over to her because he had indorsed them guaranteeing their payment. This should be done, not only for the reason assigned in the answer, but for the further reason that these notes are a part of the debt referred to in the will, and especial provision is made therein, which makes the entire estate responsible for the payment of this debt.

The evidence in this case took a wide scope, and there was some proof taken showing that the land which appellee owned was used by her husband between the date of the execution of the will and his death, also that its reasonable rental value was so much per year during that time; the aggregate value of this rental, as fixed by the witnesses, being $1,000.

Appellee had made no claim for this rental in her answer, nor did she present any such claim to the commissioner to whom the case was referred. In deed it is not now clear that she really wants to assert this claim. Her husband certainly did not in any way, during the 8 years covered by the proof of this claim, indicate that he was to pay rent for it. He made no record of it in any way, although we find that he was very particular and careful in dealing with his wife's property. As he did not charge himself with this rent, nor indicate, so far as the record shows, that he was expecting to pay same, we are led to believe that he was not contemplating paying rent, nor does the evidence justify the conclusion that his wife was expecting him to pay.

It appears that at some time during this period the turnpike roads in Boyle county were purchased by the county. Appellee owned some stock in one of them, and in the settlement of the transaction there was paid to her the sum of $90.21. Some claim is made that her husband's estate should be chargeable with this sum, but an examination of the checks shows that they were all made payable to her, and were indorsed by her. Presumably she received the money on them; and certainly the evidence does not justify the claim that her husband's estate should be made answerable for this sum. The claim that appellee is entitled to credit for the proceeds of a note amounting to $500, which was paid by her brother, John, can not be allowed, for the reason that the money for which this note was executed was a part of the original debt, or of the proceeds of some of the notes referred to in the will; and, having been charged in that item, his estate can not be made answerable for it again. On the question of the claim for taxes per-

sonally paid by the testator on his wife's property during his lifetime, and for which the administrator seeks credit, we are of opinion that, as testator had the management of his wife's business and control of her money, if he had intended that these claims should be a charge against her, he would have paid them out of her money. This claim, like the claim for land rent and pike proceeds, is stale and has no merit in it.

Having considered all of the claims made by the pleadings and the proof before the master, and all evidence of indebtedness brought out by the testimony and exhibits filed, we find that appellee is entitled to her claim of $13,000, with interest from the date of the will, to-wit, November 27, 1894, amounting to $22,230, calculating the interest to September 27, 1906. Also to the further claim of $1,199.80, with interest from the same date, and calculating this to September 27, 1906, amounting to $2,051.57. She is also entitled to the further sum of $3,063, this being the dividends accruing on her bank stock, during the years between 1894 and the death of her husband. We are aware that appellee's counsel admits that the claim for $2,051.57 should have a credit which would reduce it to $1,422.65, but this admission is made on the mistaken idea and belief that appellee was entitled to be allowed her claim for the amount of the checks which we have rejected. Her claim is to be credited by the notes which she admits she had on hand, and which, according to the commissioner's report and the judgment of the court, on September 27, 1906, to which date all interest calculations are made, amounted to $6,803.36. Deducting this from her total claim of $27,344.57, there was due her a balance of $20,-541.21, as of date September 27, 1906. Her husband had guaranteed the payment of the notes which she

held, and which, on September 27, 1906, amounted to $6,803.36. The chancellor recognized the validity of this guaranty, and gave appellee the option of returning the notes and receiving from the estate cash in lieu thereof. She is entitled to have her claim increased by the face value of such notes as she returned within the time limit, calculating the interest at 6 per cent from the time. when interest began to run on each note to September 27, 1906; and, if any payment of interest or principal was made to her on any of the notes returned between September 27, 1906, and the date upon which she surrendered them, this sum should be charged to her.

Complaint is made that the allowance to the commissioner is excessive. Both appellant and appellee unite in this complaint. Appellee further contends that the allowances to the administrator and his attorney are excessive, while appellant and his counsel complain that they are not large enough. The allowances to the commissioner and the administrator are governed by statute, and the allowance to the attorney for his services, while not regulated by statute, is required to be reasonable. Section 1740 of the Kentucky Statutes of 1909 provides that a master commissioner shall, in the absence of any special agreement with the parties, receive $3 per day for the time he is actually employed or engaged in the discharge of his duties. This provision is mandatory, and the court is without authority to exceed this limit. It is further provided in this section that the per centum which a commissioner shall receive for collecting and disbursing money under order of court shall be as follows: "Where the amount is more than one thousand, but does not exceed two thousand dollars, two per cent. on the first thousand, and one and one-half per cent.

on the excess. Where the amount is more than two thousand, but does not exceed five thousand dollars, two per cent. on the first thousand, and one and one-half per cent. on the second one thousand, and one per cent. on the excess. Where the amount is over five thousand dollars he shall receive fees on the first five thousand dollars, as above provided, and one-half of one per cent. on the remainder." The right of the commissioner to compensation is further regulated and controlled by section 396 of the Kentucky Statutes of 1909, which is as follows: "No allowance in any case shall be made to a commissioner or receiver until he has filed in court a written statement under oath of the number of days he has acted; and in all cases evidence may be heard for and against an allowance." This section is mandatory, and its provisions must be complied with. We fail to find in the record a statement from the commissioner showing a compliance with this provision of the statute. His report on claims shows that he was actually engaged for more than 200 days during the two years that the case was before him. Under this statement, if it be accepted as a compliance with section 396, he is entitled to pay for but 200 days' service at $3 per day, or $600, on account of this item. His per centum must be based upon the money which he actually receives and pays out. The entire estate, based upon the actual amounts reported by the administrator upon his first and second settlements, and the estimate which the commissioner made to be the value of the remainder of the estate at the time the second settlement was made, is, in round numbers, $109,000; but of this sum the administrator reported in his first and second settlements that he had paid out $32,400, so that the most that the commissioner could possibly handle would be

$76,600. Taking this as the basis, and allowing him his full commission as fixed by the statute, he would only be entitled to receive $423 on this account, making his total claim $1,023, and this contemplates that he should receive and pay out all of the money that has so far not been disposed of.

The compensation of the administrator is fixed by statute (section 3883) which is as follows: "The allowance to executors, administrators and curators shall not exceed five per cent. on all the amounts received and distributed: Provided, That upon proof heard in open court, upon proper notice to the parties in interest, the court may make an allowance when the executor, administrator or curator has, in the proper discharge of his duties in attending to, administer- and settling the estate in his hands, been required to perform extraordinary services; but such allowance shall not exceed in amount a fair compensation for the time occupied, and expenses incurred in protecting, attending to and settling such estate, and five per cent. on all amounts received and distributed." The court was familiar with the character and extent of the services rendered by the administrator, but nevertheless he heard proof on the value of the services of the administrator to the estate, and, upon the proof so heard, fixed $3,500 as a fair compensation for the same, although the witnesses fixed a higher value. The record shows that the testator at the time of his death left his business, which was that of operating a planing mill and building houses, in a very tangled and unsettled condition. Appellant was called upon to operate the mill for some three or four months, and finish nine houses which were under way at the time of the testator's death. From 600 to 800 persons were indebted to the testator, and these had to be settled

with.  Many of them lived in adjoining counties, which necessarily required much of appellant's time and the expenditure of some money in looking after same. Appellant was required, in the interests of the estate, to be present during the taking of the proof before the commissioner, which, according to the commissioner's report, lasted for more than 200 days.  He conducted the sale of real and personal estate, amounting in the aggregate to about $50,000.  He had collected, at the date of the judgment, over $70,000, and out of this sum paid claims amounting to more than $30,000, and, under the direction of the court paid the balance to the commissioner.  It is estimated that the estate, administered and yet to be administered, will amount to something like $109,000.  We are of opinion that as the court allowed the administrator about 5 per cent., which was the maximum that he could have allowed him under the law, upon the money which he had handled at the time the allowance was made, it was a reasonable and fair allowance for the services which had been rendered to that date; but there is a large part of the estate yet to be disposed of, notes to be collected, and the business of the estate in the hands of the administrator closed up. This will require time, and impose upon the administrator a responsibility for which he is entitled to compensation.  Taking into consideration the allowance heretofore made to the administrator, we are of opinion that an additional allowance of $1,000 should be made him to cover in full the services rendered since the rendition of the judgment, and yet to be rendered by him in collecting any moneys due the estate, and in attending to all and several the duties pertaining to his office in closing up the business of the estate in his hands.

The court heard proof on the claim of appellant for a reasonable allowance to his attorney, as a fee for services in the settlement of the estate. No witness fixed the value of these services at less than $5,000. The court allowed him $4,000. Appellant is complaining that it is too little, while appellee says it is excessive. It should be reasonable. This is a large estate; and, while an attorney should have a more liberal allowance made him for his services in advising the personal representative in the settlement of a large estate than he should where less money is involved, his fee should, in the main, be regulated by the character of the services he renders the estate. If this service is valuable, his compensation should be liberal. If it is not valuable, and yet competent and good his compensation should be fair. No fixed rule can be adopted by which a scale of fees for attorneys can be laid down. All that can be said is that they must be reasonable, taking into consideration the character of services rendered, the time employed, the size of the estate, and the extent of the litigation. In this case we have a large estate, consisting of real and personal property. Under the advice of his attorney the administrator sold and converted all of this property into cash. He has advised the administrator, from the time he qualified in 1903 to the present time, in the conduct and management of the estate. He filed this suit for settlement, and has, with diligence and ability at all stages of the litigation, sought to protect the estate against the imposition of spurious and improper claims. The litigation has been spirited, and at times acrimonious. Three branches of this litigation have reached this court, and the attorney for plaintiff has looked after the appeals here. The character of the services which he has rendered the estate in the cir-

cuit court and this court is best illustrated by the results achieved. The first appeal involved the right of the administrator with the will annexed to sell the real estate, and this court in Harding's Admr. v. Weisiger (Ky.), 109 S. W. 891, upheld the contention of plaintiff's counsel that the administrator had such right, and reversed the finding of the lower court. The second appeal was from the judgment of the lower court, rejecting practically the entire claim presented by John Weisiger for $6,000. The judgment of the lower court was affirmed. The third and last appeal is now before us, and involves the validity of appellee's claim for more than $40,000. Through his efforts he has successfully represented the estate in defeating the collection of something like $35,000 in claims which were presented against the estate, and which neither the administrator nor his attorney believed to be valid and just claims. He attended the sittings of the commissioner during the 200 days he was engaged in taking proof, and gave to the litigation at all times careful and painstaking attention. Many of these which he was called upon to discharge were necessarily more or less embarrassing. They involved him in a family quarrel, and no doubt engendered against him a bitter state of feeling, if not animosity, on the part of his brother's widow and her people, yet this did not deter him for throughout the litigation he discharged his whole duty to the estate, whose interest he was employed to protect, with that degree of fidelity and ability which marks him as the good lawyer which he is. This service was well worth $5,000 to the estate, and on the proof heard the judge should have allowed this sum.

The judgment is reversed and remanded, with in-

structions to the lower court to enter a judgment in conformity with the directions set out in this opinion.